**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JOSE MALDONADO,<br>*Plaintiff*,<br><br>v.<br><br>ADRIAN SANCHEZ,<br>*Defendant*. | )<br>)<br>)<br>)<br>)<br>)<br>) | 3:25-CV-00241 (SVN)<br><br><br><br><br><br>September 30, 2026 |

**RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT**

Sarala V. Nagala, United States District Judge.

In this civil rights action, Plaintiff Jose Maldonado alleges that Defendant Adrian Sanchez arrested him "with malice" following an investigative police stop, thereby violating Plaintiff's Fourth Amendment rights. Plaintiff's complaint alleges: (1) Defendant did not have reasonable suspicion to conduct a *Terry* stop; (2) Defendant falsely arrested him; and (3) Defendant maliciously prosecuted him. *See* Compl., ECF No. 1 at 6–7.

Defendant moves for summary judgment in his favor, arguing that he did not violate Plaintiff's Fourth Amendment rights and, in any event, is entitled to qualified immunity with respect to Plaintiff's arrest.[1] Plaintiff did not respond to Defendant's motion for summary judgment.

For the reasons described below, the Court agrees with Defendant that he did not violate Plaintiff's constitutional rights, and GRANTS his motion for summary judgment.

## I. FACTUAL BACKGROUND

Plaintiff brings a 42 U.S.C. § 1983 claim against Defendant for conducting an illegal search in violation of his Fourth Amendment rights. ECF No. 1 at 6. Plaintiff alleges that on December

[1] Defendant does not argue that he is entitled to qualified immunity with respect to the *Terry* stop, so the Court does not address that issue.

22, 2022, Defendant searched his person—without reasonable suspicion or probable cause—and arrested Plaintiff for possession of a firearm, even though Defendant's report identified the gun as a replica. *Id.*; *see also id.* at 9 (noting December 22, 2022 date). Plaintiff was incarcerated for 100 days prior to dismissal of all charges. *Id.* at 6.

The following facts are largely drawn from Defendants' Local Rule 56(a)1 Statement and supporting exhibits. As Plaintiff has not opposed Defendants' summary judgment motion,[2] and has not submitted a statement pursuant to Local Rule 56(a)2,[3] the Court will deem the facts set forth in Defendants' Local Rule 56(a)1 Statement admitted where they are supported by evidence. *See* D. Conn. L. Civ. R. 56(a)1 ("Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for the purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed

[2] Upon filing his summary judgment motion on January 19, 2026, Defendant informed Plaintiff of his obligation to respond to the motion for summary judgment and the contents of a proper response. *See* Not. To Self-Represented Litigant, ECF No. 30, but Plaintiff has neither filed a Local Rule 56(a)2 Statement responding to Defendant's Local Rule 56(a)1 Statement, nor a memorandum in opposition to the motion. After Plaintiff failed to timely file a response, the Court *sua sponte* granted Plaintiff an extension of time to file a response to Defendant's motion until February 24, 2026, explaining that "[i]f Plaintiff fail[ed] to file his response and motion for extension of time by that date, the Court [would] consider the motion unopposed." ECF No. 31. To date, Plaintiff has filed nothing in response to Defendant's motion. The Court therefore treats the motion as unopposed, but is aware of its obligation to examine Defendant's submissions to determine if he has met his burden of demonstrating that there are no material issues of fact remaining for trial. *See Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

[3] Although a verified complaint may be treated as an affidavit for summary judgment purposes provided that it meets the requirements of Federal Rule of Civil Procedure 56(c), *see Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004), Plaintiff's complaint is not verified. The standard for verification comes from 28 U.S.C. § 1746, which requires that a declarant in the United States include the following text in "substantially" the same form, along with date and signature: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct." *See, e.g.*, *Conquistador v. Hurdle*, No. 20-CV-01658 (KAD), 2022 WL 17821097, at *3 n.4 (D. Conn. Dec. 20, 2022) (concluding that complaint that did not include verification that it was made under penalty of perjury did not qualify); *Rickett v. Orsino*, No. 10 CIV. 5152 (CS) (PED), 2013 WL 1176059, at *2 n.5 (S.D.N.Y. Feb. 20, 2013) (concluding that complaint submitted under penalty of perjury qualified). Plaintiff's amended complaint contains no statement that it was submitted under penalty of perjury. *See* ECF No. 1 at 7. Accordingly, the Court refers to Plaintiff's amended complaint for the purposes of background and discussing his claims, but not as an affidavit opposing Defendants' summary judgment motion. On the other hand, the attachment to Plaintiff's complaint, "Citizen Recognition/Complaint Form" *is* subscribed and sworn to before a notary under penalty of perjury (citing Conn. Gen. Stat. § 53a-157, now codified at Conn. Gen. Stat § 53a-157b). *See id.* at 8–10. Accordingly, the Court considers this an affidavit where its statements rest on personal knowledge. *See* Fed. R. Civ. P. 56(c)(4). But because the admissible statements in this filing do not evince that there are genuine disputes of material fact requiring a trial, the Court ultimately references this filing for the same purposes as it references the complaint—as merely a resource illuminating Plaintiff's claims.

and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact.").

At the relevant time, Defendant was a Sergeant with the Waterbury Police Department ("WPD"). Def's. Local Rule 56(a)1 Statement, ECF No. 28-8[4] ¶ 1. On December 22, 2022, at around 5:26 p.m., Defendant, alongside members of the WPD Crime Prevention Unit (CPU), was patrolling the Baldwin Street area of Waterbury due to multiple "quality of life" complaints, including gunshots and firearms complaints and narcotics usage/distribution. *Id.* ¶ 3. The CPU consisted of two vehicles, one operated by Officer Nicol with three CPU officers as passengers, and a second vehicle operated by Sargeant Shaban, in which Defendant was a passenger. *Id.* ¶¶ 5–6. Shaban and Defendant both wore bodycams, and their vehicle had a dashcam. *Id.* ¶ 7.

It was dark and raining that evening. *Id.* ¶ 13. From his car, Defendant noticed a vehicle parked more than six inches from the curb with its engine running. *Id.* ¶ 8. A man later identified as Plaintiff was standing on the pavement outside the vehicle. *Id.* Defendant avers that he witnessed Plaintiff leaning into the front window of the vehicle with his hand on the passenger door handle.[5] ECF No. 28-1 ¶ 8. Plaintiff states that he was walking home from Dunkin Donuts in downtown Waterbury when the officers approached him. ECF No. 1 at 9.

---

[4] Defendant's Local Rule 56(a)1 Statement appears on the docket both at ECF No. 27 and at ECF No. 28-8. The Court cites to the version at ECF No. 28-8, as it accompanies Defendant's other summary judgment filings.

[5] Upon careful review of the dashcam photos and videos to which Defendant cites, *see* ECF No. 28-1 ¶ 8 (citing Exhibit 3, ECF No. 28-3; Exhibit 4, ECF No. 28-4, and Exhibit 5, ECF No. 28-5), the Court notes that the videos and photos do not appear to capture Plaintiff leaning into or otherwise making contact with the vehicle. For example, in the first photo frame of the dashcam video in ECF No. 28-5 at 2, Plaintiff appears to stand a short distance away from the car idling on the roadway. Nor do the videos themselves show Plaintiff leaning into the vehicle or touching it. *See* ECF Nos. 28-3, 28-4. Because the video and photo exhibits do not provide support for this fact, the Court notes that it admits this fact based on Defendant's affidavit, which does suggest that his observation occurred "[a]s our vehicle was approaching the area," i.e., when the dashcam footage is indiscernible. *See* Sanchez Aff., ECF No. 28-1 ¶ 8. Because the record before the Court offers no facts contradicting Defendant's account on this point, the Court deems the fact admitted, as supported by Defendant's affidavit.

Officer Nicol's car pulled in front of the idling vehicle to prevent it from fleeing. ECF No. 28-8 ¶ 9. Officer Nicol also activated his lights, and Plaintiff stepped onto the sidewalk, away from the roadway and the parked vehicle. *Id.* ¶ 10. Upon exiting the cruiser, Defendant observed that Plaintiff looked extremely nervous—"his eyes were wide open in apparent fright," *id.* ¶ 11, and he wore multiple layers of clothing, making it difficult to observe whether Plaintiff was armed, *id.* ¶ 13. Based on Defendant's training and experience, he recognized Plaintiff's actions as consistent with individuals engaged in narcotics transactions and those possessing illegal weapons and/or contraband. *Id.* ¶¶ 12, 14.

Plaintiff avers that officers approached him and grabbed him by the arm. ECF No. 1 at 9. Plaintiff also asked Defendant why he was being detained and confirmed if the officers had body cameras. *Id.* Defendant conducted a pat-down of Plaintiff and asked him if he carried any weapons or contraband. ECF No. 28-8 ¶ 15. Initially, Plaintiff told Defendant that he only carried a cell phone in his pocket, *id.* ¶ 16, but when Defendant asked about the sharp object in Plaintiff's jacket pocket, Plaintiff responded "sorry officer that's my knife," and removed a folding knife in the open position from his pocket, *id.* ¶ 17. Defendant asked Plaintiff if he had any additional weapons, and Plaintiff stated that he had a replica gun in his sweater pocket. *Id.* ¶ 18. Defendant then handcuffed Plaintiff for officer safety and recovered a .22 caliber Talon Derringer pistol from Plaintiff's sweater pocket. *Id.* ¶ 19.

Because Defendant had never seen a Talon Derringer pistol or similar weapon, he ran a Google search and confirmed that the Talon Derringer pistol had a steel barrel where a single .22 caliber bullet can be loaded and discharged; additionally, the barrel of the pistol was less than twelve inches in length. *Id.* ¶¶ 20–21, 25. Defendant then searched law enforcement databases and confirmed that Plaintiff (1) did not have a valid pistol permit; (2) was the subject of two

protective orders prohibiting him from possessing firearms; and (3) had a felony conviction disqualifying him from possessing a firearm. *Id.* ¶¶ 22–24.

As a result of Defendant's investigation, Plaintiff was placed under arrest and transported to the Waterbury Police Headquarters. *Id.* ¶ 26. The police also transported the pistol to the Forensic Unit as evidence. *Id.* ¶ 27. Plaintiff was charged with (1) criminal possession of a pistol, in violation of Conn. Gen. Stat. § 53a-217c; (2) carrying a pistol without a permit, in violation of Conn. Gen. Stat. § 29-28; (3) illegal transfer/sale of a firearm, in violation of Conn. Gen. Stat. § 29-33; and (4) two counts of criminal violation of a protective order, in violation of Conn. Gen. Stat. § 53a-223. *Id.* ¶ 28.

On December 22, 2022, Sergey Babakov, a WPD Crime Scene Technician, received and secured the pistol secured during Plaintiff's arrest and took three photos of the weapon. *Id.* ¶¶ 29–30. One of the photos shows the "pistol barrel in an open position in which a single bullet can be placed" and fired. *Id.* ¶ 31.

In Plaintiff's complaint, he alleges that he was incarcerated for 100 days until all charges were dismissed.[6] ECF No. 1 at 6.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). With respect to genuineness, "summary judgment will not lie if the

[6] There is no publicly available information indicating a conviction or pending criminal case against Plaintiff for these events. *See generally Criminal/Motor Vehicle Case Look-up*, State of Connecticut Judicial Branch, https://www.jud.ct.gov/crim.htm (last visited September 29, 2026).

dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. A movant, however, "need not prove a negative when it moves for summary judgment on an issue that the [non-movant] must prove at trial." *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001). "It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324). The non-moving party, in order to defeat summary judgment, must come forward with specific evidence—beyond "conclusory allegations or unsubstantiated speculation"—that would be sufficient to support a jury verdict in his or her favor. *Anderson*, 477 U.S. at 249; *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). If the non-movant fails "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable

inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted). In doing so, courts may consider video evidence. *See Scott v. Harris*, 550 U.S. 372, 381 (2007). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

Moreover, the Court bears in mind that a *pro se* litigant's filings must be liberally construed to raise the strongest arguments they suggest. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013); *see also Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010) (collecting cases regarding the "special solicitude" afforded to *pro se* litigants). Although it is "well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants," a court may enter summary judgment against a *pro se* nonmovant who has been advised of the nature of the motion for summary judgment and the consequences of failing to respond to it properly, *Tracy*, 623 F.3d at 101–02; *see also Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996), provided that the movant's submissions demonstrate there are no material issues of fact remaining for trial. *See Vermont Teddy Bear Co.*, 373 F.3d at 244.

## III. DISCUSSION

The Court grants Defendant's motion for summary judgment because Defendant did not violate Plaintiff's Fourth Amendment rights and, in any event, is entitled to qualified immunity with respect to Plaintiff's false arrest and malicious prosecution claims.

The Fourth Amendment protects people against "unreasonable searches and seizures." U.S. Const., amend. IV. But the Fourth Amendment's protections do not cover every encounter between an individual and a police officer. *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990). Encounters between police and individuals only fall under Fourth Amendment scrutiny when they

involve a search or seizure. *See I.N.S. v. Delgado*, 466 U.S. 210, 214 (1984). And a seizure has occurred "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988); *see also Delgado*, 466 U.S. 210, 215–16.

Interactions between police officers and individuals are separated into three categories: consensual encounters, investigative detentions, and arrests. *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995). On one end of the spectrum, consensual encounters do not require any police justification when the "police do not convey a message that compliance with their requests is required." *Id.* (quoting *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992)). On the other end, arrests are seizures under the Fourth Amendment and require probable cause. *Glover,* 957 F.2d at 1008. Investigative detentions fall in the middle of these extremes. Seizures that are "less intrusive than a traditional arrest" depend upon a balance between public interest and "the individual's right to personal security free from arbitrary interference by law officers." *Brown v. Texas*, 443 U.S. 47, 50 (1979) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977)). Thus, investigative detentions, which may be brief, are seizures and require "reasonable suspicion" supported by articulable facts that criminal activity has occurred or will occur. *Id.* at 51–52; *see also Glover*, 957 F.2d at 1008 (citing *Terry v. Ohio,* 392 U.S. 1 (1968)). These encounters are known as "*Terry*" stops. *See Glover*, 957 F.2d at 1008–09; *United States v. Levy*, 217 F. Supp. 3d 643, 658 (E.D.N.Y. 2016).

Here, Plaintiff alleges that his investigative detention, search, and arrest violated the Fourth Amendment. *See* ECF No. 1 at 6. Plaintiff also claims that he was the victim of malicious prosecution. *Id.*

A. *Terry* Stop

First, the Court grants summary judgment in favor of Defendant on Plaintiff's *Terry* stop claim.

A *Terry* stop is an investigative detention, which "represents an intermediate response allowing police to pursue a limited investigation when they lack the precise level of information necessary for probable cause to arrest." *United States v. Elmore*, 482 F.3d 172, 178 (2d Cir. 2007). In these situations, police may briefly detain an individual based on "a reasonable suspicion that criminal activity is afoot, and may frisk him if they reasonably believe he is armed and dangerous." *Id.* (citing *Terry,* 392 U.S. at 30).

Here, Defendant detained Plaintiff and frisked him to search for weapons, which is a search for Fourth Amendment purposes. *United States v. Weaver*, 9 F.4th 129, 141–42 (2d Cir. 2021) (en banc) (frisking an individual is a search under the Fourth Amendment, as individuals have a "right to the security of his person"). "Even a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security." *Terry*, 392 U.S. at 24–25. The constitutionality of such searches are analyzed under *Terry*'s two-part test, in which the Court determines: (1) "whether the officer's action was justified at its inception," and (2) "whether [the action] was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 19–20; *see also Tehrani*, 49 F.3d at 60–61.

*1. Justification at Inception*

Under step one of the *Terry* test, the stop in this case was permissible because it was justified at its inception. A *Terry* stop is justified at its inception if "reasonable suspicion" existed that the individual has been, or is about to be, engaged in criminal activity. *Glover*, 957 F.2d at 1009. For frisks, a stop is justified only when there is both reasonable suspicion of criminal activity and that the suspect is "armed and dangerous." *See Weaver*, 9 F.4th at 139.

a. Reasonable Suspicion of Criminal Activity

The standard for reasonable suspicion is "not high." *Id.* at 140 (quoting *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014). Reasonable suspicion is "considerably less than proof of wrongdoing by a preponderance of the evidence," and thus less than the showing required to demonstrate probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). However, reasonable suspicion requires more than an "'inchoate and unparticularized suspicion or hunch.'" *Elmore*, 482 F.3d at 178 (quoting *Alabama v. White*, 496 U.S. 325, 329 (1990)).

The standard for reasonable suspicion is objective and does not depend on the intentions or motives of the detaining officers. *Glover*, 957 F.2d at 1010. Because police officers respond to developing situations that require swift responses, the Court considers "the totality of the circumstances surrounding the stop" to determine whether the police acted reasonably. *Id.*; *Weaver*, 9 F.4th at 140–41. For example, a stop's occurrence in a "high crime area" is relevant to such analysis, though "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *Weaver*, 9 F.4th at 150. And particularly within the context of suspected narcotics trafficking, conduct may be suspect to a police officer, even if it appears "innocuous" to the untrained observer. *Glover*, 957 F.2d at 1010–11 (citing *United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991)); *see also United States v. Padilla*, 548 F.3d 179, 187–88 (2d Cir. 2008) (stating that *Terry* recognizes that multiple innocent acts, taken together, may warrant detaining an individual); *Weaver*, 9 F.4th at 151 (finding it relevant whether suspicious activity occurred at night).

The court also considers a police officer's training and expertise to determine whether there is reasonable suspicion. *See Terry*, 392 U.S. at 27 (stating that police officers can make "reasonable inferences . . . in light of his experience"); *see also Villegas*, 928 F.2d at 517 (noting

that "[a]n experienced narcotics investigator could conclude" suspicious activities were consistent with narcotics transaction); *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (noting that circumstances are viewed according to perspective of a "reasonable and cautious police officer on the scene, guided by his experience and training") (quotations and citations omitted). In *Padilla*, for example, police officers who were "conducting narcotics surveillance in a high-crime neighborhood" had reasonable suspicion to initiate a *Terry* stop, based on a combination of factors that suggested a potential robbery or drug transaction. 548 F.3d at 187–89 (holding that multiple factors supported police officer's suspicions, including the two suspects' choice to walk an unlit path at night in a high-crime neighborhood, suspects following a disheveled man in single file line, and adjustment of clothing in manner consistent with concealed carry). Additionally, the Court may consider a suspect's nervous or evasive behavior to find reasonable suspicion, though it may not provide the sole basis for a stop. *Wardlow*, 528 U.S. at 124 ("nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"); *United States v. Lopez*, 432 F. Supp. 3d. 99, 115–16 (D. Conn. 2020) (an officer must provide "articulable facts going beyond the surprise or nervousness one should expect to observe in any case").

Here, Defendant had reasonable suspicion of criminal activity to justify a *Terry* stop.[7] Defendant highlights that the stop occurred at night in a high-crime area known for narcotics issues and gun violence. ECF No. 28-8 ¶ 3. Defendant observed Plaintiff lean into the front window of the car with his hand on the passenger door handle. ECF No. 28-1 ¶ 8. Further, Plaintiff was "extremely nervous," ECF No. 28-8 ¶ 11, and Defendant could not easily discern whether Plaintiff

[7] The Court rejects Defendant's assertion that reasonable suspicion was not required because he was merely conducting "further investigation" when he initially approached Plaintiff. *See* ECF No. 28-7 at 5–6 (citing *Lopez*, 432 F. Supp. 3d at 113). As *Lopez* itself holds, a "seizure amounting to a *Terry* stop" occurs when police use a patrol car to box in an individual's vehicle or when an officer activates his cruiser lights. *Lopez*, 432 F. Supp. 3d at 110. Those facts were present here; thus, the encounter was a seizure amounting to a *Terry* stop from the outset, requiring reasonable suspicion.

possessed a weapon, given that it was dark and rainy and Plaintiff was wearing multiple layers of clothing, *id.* ¶¶ 12–13. Based upon Defendant's training and experience, he identified Plaintiff's actions as consistent with someone who may be involved with narcotics transactions and/or in possession of illegal weapons/contraband. *Id.* ¶¶ 12, 14. Taken together, and in the absence of any submissions from Plaintiff contradicting these facts or making any argument that these facts do not amount to reasonable suspicion, the Court concludes that the totality of the circumstances demonstrate that Defendant had reasonable suspicion to conclude that "criminal activity [was] afoot," and the stop was justified at its inception. *See Elmore*, 482 F.3d at 178 (citing *Terry,* 392 U.S. at 30).

b. Reasonable Suspicion that Plaintiff Was "Armed and Dangerous"

Next, after identifying suspected criminal activity, the police officer must have reason to believe that the suspect is "armed and dangerous." *Weaver*, 9 F.4th at 139. It is "clearly unreasonable to deny [an] officer the power to take necessary measures to determine whether the person [he is detaining] is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry*, 392 U.S. at 24. And an officer may reasonably fear danger "long before" he has sufficient information to arrest the individual. *Id.* at 26–27. Further, an officer is not required to be "absolutely certain" that his detainee is armed. *Id.* at 27. Rather, the inquiry focuses on whether a "reasonably prudent man in the circumstances would be warranted in the belief" that his safety or others' safety was in danger. *Id.*

Just as the Court considers an officer's judgment in identifying potential criminal activity, the Court considers the officer's judgment and expertise when determining whether a suspect is armed. *See Terry*, 392 U.S. at 28 (holding that police officers reasonably believed suspect was armed based on hypothesis of daylight robbery, which likely would include weapons); *Padilla,* 548 F.3d at 189 (relying on officer's experience that gestures, such as reaching underneath jacket

and adjusting a "weighty object," were consistent with carrying a firearm); *Weaver*, 9 F.4th at 148–49 (finding that suspect's conduct was consistent with carrying a firearm, such as squirming and pushing on pelvis, especially in the "eyes of a 'trained police officer'") (citation and footnote omitted); *Mimms*, 434 U.S. at 112 (stating that a bulge in suspect's jacket reasonably permitted officer to conclude suspect was armed). As long as the officer has a "good reason to believe" that the suspect is armed, the police officer does not need to rule out other explanations or illegal conduct, such as carrying narcotics. *Weaver*, 9 F.4th at 149 ("A police officer, placed into an uncertain and developing situation, is not tasked with sorting through multiple possible scenarios and conducting a frisk for weapons only if that is the sole, or even the most likely, possibility.").

Here, Defendant had reasonable suspicion that Plaintiff was carrying weapons because the police suspected Plaintiff had been involved in a narcotics transaction. *See United States v. Crespo,* 834 F.2d 267, 271 (2d Cir. 1987) ("We often have taken judicial notice that, to substantial dealers in narcotics, firearms are as much tools of the trade as are the commonly recognized articles of narcotics paraphernalia."); *United States v. Santillan*, 902 F.3d 49, 59 (2d Cir. 2018) (where officers had reasonable suspicion that the individual was involved in some types of criminal activity, and because "[n]arcotics activity and weapons often go hand in hand" and investigative detentions are "fraught with danger for the officer," the officers had reasonable suspicion that the individual was armed and dangerous); *see also Ochoa v. City of W. Haven,* No. 3:08-CV00024 (DJS), 2011 WL 3267705*,* at *5 (D. Conn. July 29, 2011) (indicating that police officers have reasonable suspicion of weapons during a narcotics transaction).

Defendant's affidavit states that Plaintiff's conduct was consistent with an individual engaged in narcotics transactions, that Plaintiff's heavy clothes and the darkness of night concealed whether or not Plaintiff possessed a weapon, and that he conducted the pat-down for officer safety.

ECF No. 28-1 ¶¶ 12–13, 15. In light of the undisputed nature of these facts on the present record, Defendant demonstrates reasonable suspicion of Plaintiff being armed in support of the search.

*2. The Search's Scope*

Under step two of the *Terry* test, the Court must determine "whether [the action] was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19–20. Here, the search's scope was constitutionally permissible because it was limited to searching for weapons.

The scope of a search for weapons must be confined to reasonably discover guns, knives, and other weapons. *Terry*, 392 U.S. at 29. Such searches are not intended to discover evidence of a crime, but rather to permit the officer to "'pursue his investigation without fear of violence.'" *Padilla*, 548 F.3d at 187 (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)). Here, the search began with questioning Plaintiff contemporaneous with a pat-down of Plaintiff's outer clothing. ECF No. 28-8 ¶ 15. Although Plaintiff initially responded that he only had a cell phone in his pocket, Defendant recovered a knife during the pat-down, and, in response to questioning, Plaintiff stated that he had a replica gun on his person, which Defendant found in Plaintiff's pocket after placing him in handcuffs. *Id.* ¶¶ 17–19. Because Defendant limited his search to a pat down and accessing the pockets of Plaintiff's clothing where he determined weapons were likely located, the search was appropriately limited to identifying weapons for officer safety.

In sum, the court finds that there is no genuine dispute of the material facts showing that the *Terry* stop was justified at its inception and reasonable in scope. Defendant had reasonable suspicion of Plaintiff's criminal activity and that Plaintiff was armed, and appropriately tailored the search to identifying any weapons on Plaintiff's person. Thus, the Court grants summary judgment in Defendant's favor on Plaintiff's *Terry* stop claim.

B. Arrest and Charges

*1. False Arrest*

Because Defendant had probable cause to arrest Plaintiff, and, regardless, Defendant is entitled to qualified immunity, the Court also grants Defendant's motion for summary judgment as to Plaintiff's false arrest claim.

"Claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are substantially the same as claims for false arrest or malicious prosecution under state law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (internal quotation marks and citations omitted). In order to prevail on his false arrest claim under Connecticut law, Plaintiff must show that "(1) the defendant intentionally arrested him or had him arrested; (2) the plaintiff was aware of the arrest; (3) there was no consent to the arrest; and (4) the arrest was not supported by probable cause." *Edelman v. Page*, No. 3:00-cv-01166 (JAM), 2015 WL 1395893, at *11 (D. Conn. Mar. 25, 2015) (quoting *Sharnick v. D'Archangelo*, 935 F. Supp. 2d 436, 443 (D. Conn. 2013)); see also *Nodoushani v. S. Conn. State Univ.*, 152 Conn. App. 84, 92–93 (2014).[8]

A false arrest claim must fail "if there was probable cause to arrest the plaintiff for *any* offense." *Warner v. Freeman*, No. 3:14-CV-1192 (DFM), 2016 WL 5348569, at *3 (D. Conn. Sept. 23, 2016) (emphasis added) (citing *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006)). Otherwise stated, "an arresting officer need not have had probable cause to arrest the plaintiff for the specific offense invoked at the time of the arrest, or the particular offense with which plaintiff

[8] In addition, "the Second Circuit has held that favorable termination [of the underlying criminal proceedings] is an element of false arrest under Connecticut law," though the Connecticut Supreme Court has not addressed this question. *Ruttkamp v. De Los Reyes*, No. 3:10-CV-392 (SRU), 2012 WL 3596064, at *12 (D. Conn. Aug. 20, 2012) (citing *Miles v. City of Hartford*, 445 F. App'x 379, 383 (2d Cir. 2011)). As Plaintiff's false arrest claim fails for other reasons, the Court need not take up the question of whether favorable termination is an element of a false arrest claim under Connecticut state law.

was charged." *Id.* Rather, if the officer has probable cause to arrest the plaintiff for *any* offense, the plaintiff cannot succeed on a false arrest claim. *See id.*; *see also Jaegly*, 439 F.3d at 154 ("[W]hen faced with a claim for false arrest, we focus on the validity of the *arrest*, and not on the validity of each charge.").

In making the probable cause determination, courts have held that "a police officer has probable cause to arrest someone if he or she has knowledge or reasonably trustworthy information that would suffice to warrant a person of reasonable caution in the belief that the person to be arrested has committed a crime." *Coderre v. City of Wallingford*, No. 3:08-cv-00959 (JAM), 2015 WL 4774391, at *3 (D. Conn. Aug. 13, 2015) (citing *Zalaski v. City of Hartford*, 723 F.3d 382, 389–90 (2d Cir. 2013)). The probable cause standard is "not particularly demanding." *Id.* It requires only "facts sufficient to establish the sort of fair probability [that a crime has been committed or is being committed] on which reasonable and prudent [people,] not legal technicians, act." *Zalaski*, 723 F.3d at 390 (internal quotation marks and citation omitted). "The court must look to the 'totality of circumstances' to determine whether an arresting officer had probable cause to effect the arrest and must use an objective standard in making this assessment." *Torlai v. LaChance*, No. 3:14-cv-185 (JCH), 2015 WL 9047785, at *3 (D. Conn. Dec. 15, 2015) (first citing *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002); and then citing *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007)).

In the false arrest and malicious prosecution context, "[e]ven if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). "Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers

of reasonable competence could disagree on whether the probable cause test was met.'" *Id.* (quoting *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d. Cir. 1991)). "Therefore, in situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity." *Caldarola*, 298 F.3d at 162. As in other contexts, the ultimate question is the "'objective reasonableness' of [the officer's] chosen course of action given the circumstances confronting them at the scene." *Guerrero v. Scarazzini*, 274 F. App'x 11, 13 (2d Cir. 2008) (summary order) (quoting *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995)). In the end, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Here, Defendant argues he had probable cause to arrest Plaintiff for criminal possession of a pistol, illegal transfer/sale of a firearm, and two counts of violations of protective orders. ECF No. 28-7 at 14; *see also* ECF No. 28-8 ¶ 28. Plaintiff claims that because he was in possession of a "novelty" or "replica" gun, not a real firearm, Defendant arrested him without probable cause. ECF No. 1 at 6, 9. But Defendant's uncontroverted statement of facts clarifies that he had never seen a Talon Derringer pistol (or similar looking gun) before he recovered the pistol from Plaintiff that day. ECF No. 28-8 ¶ 20. Defendant conducted a Google search to confirm the pistol's capacity to load and discharge a .22 caliber bullet, and conducted law enforcement database inquiries to confirm that Plaintiff (1) lacked a pistol permit, (2) was the subject of two valid protective orders prohibiting him from possessing firearms, and (3) had a felony conviction disqualifying him from possessing a pistol. *Id.* ¶¶ 21–24. Although Plaintiff told Defendant it was a replica gun, *id.* ¶ 18, Defendant acted on his own assessment and investigation, and the fair probability that Plaintiff possessed a functioning pistol in violation of state law. *See Zalaski*, 723

F.3d at 390; *see also* Conn. Gen. Stat. § 29-27 (defining a "pistol" as "any firearm having a barrel less than twelve inches in length"); Conn. Gen. Stat. § 53a-3(19) (defining a "firearm" as, among other things, a "pistol . . . whether loaded or unloaded from which a shot may be discharged"). Considering the totality of the circumstances, the Court finds that probable cause existed for Plaintiff's arrest on each of the four charges at issue. *See* ECF No. 28-7 at 14–18 (detailing the charges and their elements).

Even if probable cause did not exist for the arrest, Defendant is entitled to qualified immunity because he had at least arguable probable cause to initiate a charge. Because qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," Defendant enjoys its protection, here. *See al-Kidd*, 563 U.S. at 743 (quoting *Malley*, 475 U.S. at 341). Declining to take Plaintiff's word for it that the pistol was a replica gun—particularly given that Defendant had never seen that type of gun before—cannot be described as plain incompetence. Even assuming that Plaintiff is correct that the gun was a replica, mistaking a replica for the actual thing is predictable and likely, not evidence of incompetence. Indeed, after forensic examination, it was determined the pistol could shoot a bullet, ECF No. 28-8 ¶ 31; as it was also under twelve inches in length, it qualified as a "firearm" under Connecticut law. Additionally, there is no argument or evidence that Defendant knowingly acted contrary to law. Although Plaintiff asserts that the police report states that "is [sic] was not" a firearm,[9] ECF No. 1 at 9; *see also id.* at 6 ("[D]efendant stated in his report that it was in fact, a replica"), and that he believes the "arrest was in malice because of a standing protective order," *id.*, the Court cannot credit these statements

[9] This statement appears in Plaintiff's sworn-to and notarized statement attached to the complaint (as discussed above). But, of course, Plaintiff did not author the police report he describes, and the report is not in the record before the Court. Thus, Plaintiff's representation is not properly considered for purposes of assessing the summary judgment motion. *Patterson*, 375 F.3d at 219 ("Affidavits submitted in support of or in opposition to the summary judgment motion must 'be made on personal knowledge . . . .'"). Because Plaintiff did not file the report itself (or any evidence) in opposition to summary judgment, the Court finds that granting the motion for summary judgment is proper.

as raising a genuine dispute of material fact in the absence of any evidence substantiating them. Thus, because the Court concludes that Defendant had probable cause to arrest Plaintiff and, in any event, qualified immunity protects Defendant in this instance, Defendant's motion for summary judgment as to Plaintiff's false arrest claim is granted.

*2. Malicious Prosecution*

Although Defendant does not specifically address Plaintiff's malicious prosecution claim—perhaps because he did not interpret the complaint as alleging one—the Court concludes that Defendant's qualified immunity defense prevails as to this claim, too. *See* ECF No. 28-7 at 23–24.

In order to prevail on his claim for malicious prosecution, Plaintiff "must show a violation of his rights under the Fourth Amendment and establish the elements of a malicious prosecution claim under state law." *Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002) (citations omitted). First, "[t]o show a violation of his Fourth Amendment rights, a Section 1983 plaintiff asserting a malicious prosecution claim 'must . . . show some deprivation of liberty consistent with the concept of "seizure."'" *Plude v. Adams*, No. 3:12-cv-69 (AWT), 2013 WL 943730, at *1 (D. Conn. Mar. 11, 2013) (quoting *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995)). Second, to establish the elements of a malicious prosecution claim under Connecticut law, the plaintiff must demonstrate "(1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings must have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice." *Torlai*, 2015 WL 9047785, at *5 (quoting *Brooks v. Sweeney*, 299 Conn. 196, 210–11 (2010)). "[M]alice can be inferred from a want of probable cause." *Brown v. Aybar*, 451 F. Supp. 2d 374, 384 (D. Conn. 2006) (citing *Vandersluis v. Weil*, 176 Conn. 353, 356 (1978)).

Relevant here, "[t]he probable cause inquiry in the context of a malicious prosecution claim is distinct from the probable cause inquiry relevant to an assessment of a false arrest claim." *Torlai*, 2015 WL 9047785, at *6. Specifically, "probable cause to arrest as to one charge does not necessarily defeat a claim of malicious prosecution as to other criminal charges that were resolved in the plaintiff's favor." *Id.* (quoting *D'Angelo v. Kirschner*, 288 F. App'x 724, 726–27 (2d Cir. 2008) (summary order)).

As with a false arrest claim, however, "in the malicious prosecution context, a defendant is entitled to qualified immunity if the defendant had 'arguable probable cause to charge' the plaintiff." *See Caraballo v. City of N.Y.*, 726 F. Supp. 3d 140, 160 (E.D.N.Y. 2024) (quoting *Richardson v. McMahon*, No. 22-582, 2023 WL 3102910, at *2 (2d Cir. Apr. 27, 2023) (summary order)). Arguable probable cause to charge "exists where, accounting for any new information learned subsequent to an arrest, 'it was not manifestly unreasonable for [the defendant officer] to charge [the plaintiff]' with the crime in question." *Jean v. Montina*, 412 F. App'x 352, 354 (2d Cir. 2011) (summary order) (alterations in original) (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 572 (2d Cir. 1996)).

As discussed above, the uncontroverted facts demonstrate that Defendant had at least arguable probable cause to initiate each of the charges against Plaintiff for criminal possession of a pistol when Defendant recovered an (apparent) pistol from Plaintiff during search of his person, and confirmed that Plaintiff is not allowed to possess a pistol. Thus, Defendant is entitled to qualified immunity on Plaintiff's malicious prosecution claim.

## IV. CONCLUSION

For the reasons described herein, Defendant's motion for summary judgment is GRANTED. The Clerk is directed to enter judgment for Defendant and close the case.

**SO ORDERED** at Hartford, Connecticut, this 30th day of September, 2026.

*/s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE